

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-7-1998

# Henderson v. Frank

Precedential or Non-Precedential:

Docket 97-3041

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Henderson v. Frank" (1998). *1998 Decisions*. Paper 188.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/188

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 6, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3041

JOHN KENNETH HENDERSON,

      Appellant

v.

FREDERICK FRANK, Superintendent; THOMAS W.
CORBETT, JR., Attorney General

        JOHN K. HENDERSON,
        Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 96-cv-00779)

Argued: June 9, 1998

Before: BECKER, Chief Judge, ALDISERT and GARTH,
Circuit Judges

(Filed: August 6, 1998)

        Shelley Stark (argued)
        Office of the Federal Public Defender
        960 Penn Avenue
        415 Convention Tower
        Pittsburgh, PA 15222

        ATTORNEY FOR APPELLANT

David F. Pollock (argued)
Office of the District Attorney
216 County Office Building
Waynesburg, PA 15270

ATTORNEY FOR APPELLEE

OPINION OF THE COURT

ALDISERT, Circuit Judge.

Facing criminal charges at a preliminary hearing before a Commonwealth of Pennsylvania district justice, John K. Henderson signed and filed a standard waiver of counsel form. He then petitioned the state court to allow him to proceed pro se, which was allowed without a recorded colloquy between Henderson and the judge regarding the dangers of self-representation. Henderson was not represented by counsel at a subsequent pretrial hearing where he unsuccessfully moved to suppress his confession. He was represented by counsel at his trial, where a jury found him guilty of burglary, criminal conspiracy, criminal attempt to commit burglary and criminal mischief.

After failing to obtain relief from his conviction in the state court system, Henderson petitioned the district court for a writ of habeas corpus under 28 U.S.C. S 2254, alleging that his invalid waiver of counsel and subsequent lack of representation at the suppression hearing violated the Sixth Amendment. The district court denied relief and we granted a certificate of appealability. 28 U.S.C. S 2253(c)(2). We must consider two separate but related issues: First, did signing a standard waiver of counsel form at the preliminary hearing and later petitioning the court for permission to proceed pro se, by themselves, constitute a knowing, voluntary and intelligent waiver of his right to counsel at a subsequent suspension hearing? Second, if this did not satisfy Sixth Amendment waiver requirements and we grant a writ of habeas corpus, should the grant of the writ be conditioned on his receiving a new trial or merely a new suppression hearing? Before meeting these issues head-on, we must first decide whether his habeas

2

petition was time-barred under provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, and whether he exhausted state remedies before filing the Petition.

The district court had jurisdiction pursuant to 28 U.S.C. S 2241(a), and we have jurisdiction pursuant to 28 U.S.C. SS 1291 and 2253(c)(1)(A). Henderson's Notice of Appeal was timely filed. Rule 4, Federal Rules of Appellate Procedure. We will reverse and remand to the district court to issue the writ, conditioned on the Commonwealth affording Henderson a new suppression hearing and a new trial.

I.

In April, 1992, the Waynesburg, Pennsylvania Police arrested Henderson for receiving stolen property in connection with the burglary of a clothing store. Once in police custody, Henderson confessed to the burglary of the clothing store and also to the attempted burglary of a hardware store a few months earlier. He was subsequently charged with both crimes.

Prior to the preliminary hearing on July 6, 1992, Henderson applied for and was appointed a public defender. Because this particular attorney withdrew from the representation prior to the hearing, he was represented at the hearing by another public defender, Elizabeth Haque. At this hearing, Henderson submitted a form entitled "Waiver of Counsel" to the district justice. The standard form was filled out with Henderson's name, the charges of "Burglary, Criminal conspiracy, Criminal attempt, Criminal mischief & Criminal Conspiracy" and contains Henderson's signature below a series of pre-printed statements, including:

> I,   John Henderson  , have  been informed that I have the right to have a lawyer represent me, and if I cannot afford one, one will be afforded to me without cost. . . .

> I,   John Henderson  , am a ware of the permissible range of sentences and/or fines for the offenses charged. . . .

3

> I knowingly, voluntarily and intelligently waive these rights and choose to act as my own lawyer at this hearing/trial.

App. at 33. The district justice signed the form under the statement, "I HAVE DETERMINED THAT THE DEFENDANT HAS MADE A KNOWING, VOLUNTARY, AND INTELLIGENT WAIVER OF HIS RIGHT TO COUNSEL." Id.

On July 17, Henderson filed a "Petition to Proceed on own Behalf", which was granted by the trial court. It is unclear from the record whether Elizabeth Haque continued to serve as court-appointed stand-by counsel for Henderson after this point. Henderson next filed a pro se Motion to Suppress his confession, and after a suppression hearing on September 25 at which he represented himself, and at which Ms. Haque's presence is not apparent on the record, his Motion was denied. The court then appointed new counsel to represent Henderson at trial and the jury convicted Henderson on all counts. The trial court sentenced him to 5 to 20 years at Huntingdon State Correctional Institution.

Henderson appealed to the Pennsylvania Superior Court, alleging, inter alia, that he was denied the effective assistance of counsel at the suppression hearing. His conviction was affirmed and the Supreme Court of Pennsylvania denied his Petition for Allowance of Appeal, which raised a violation of "the right to counsel." The Court of Common Pleas denied his Pennsylvania Post Conviction Relief Act Petition, 42 Pa. Cons. Stat. SS 9541-9546, which also raised the deprivation of counsel issue.

Henderson gave his Habeas Corpus Petition, which was addressed to the federal district court in Pittsburgh and dated April 16, 1996, to Huntingdon SCI prison officials for delivery. The record does not disclose the precise date that his Petition was handed to the prison officials. The record does reveal that the district court clerk filed the Petition on April 25, one day after the effective date of the AEDPA amendments to the federal habeas corpus statute.

Our review of whether Henderson has exhausted his state remedies is plenary. See Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996). Whether the AEDPA applies to this

4

case, i.e., whether Henderson's Petition was pending on the AEDPA's April 24, 1996 enactment date, is a jurisdictional question subject to plenary review. See In re Flanagan, 999 F.2d 753, 756 (3d Cir. 1993). If we conclude that the AEDPA applies to Henderson's petition, then we may reverse the state court's denial of his Sixth Amendment claim only if the decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. S 2254(d); see Bey v. Morton, 124 F.3d 524, 528 (3d Cir. 1997). If the AEDPA's amendments to S 2254 do not apply, then we exercise simple plenary review. See Bey, 124 F.3d at 528.

II.

The Commonwealth has suggested that Henderson's Petition was filed after enactment of the AEDPA, which amended the federal habeas statute in two respects relevant to this case: (1) the AEDPA provides for a one-year period of limitations to file S 2254 petitions, running from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review", S 2244(d)(1)(A), and (2) it imposes a new, limited standard of review which restricts federal court action by requiring deference to the state court's legal resolution of the issue petitioned, S 2254(d).

For several discrete reasons, we are not impressed by the Commonwealth's tardy presentation of this argument which it neglected to present to the district court. First, we conclude that Henderson's Petition was timely filed prior to the effective date of the act, April 24, 1996, that therefore his Petition was pending on that date and that the AEDPA does not apply. See Lindh v. Murphy, 117 S. Ct. 2059, 2063 (1997). We reach this conclusion because we agree with Henderson's claim that he handed over his petition, which was dated April 16, 1996, to prison officials before April 24, 1996 and therefore it was timely filed. See Houston v. Lack, 487 U.S. 266, 276 (1988); Burns v. Morton, 134 F.3d 109, 112 (3d Cir. 1998) (the teachings of Houston--that delivery

5

of a notice of appeal by a pro se prisoner to prison officials is tantamount to filing with the clerk of court--apply to filing a S 2254 habeas petition).

Putting aside that the Commonwealth failed to raise this issue before the district court, we are unable to accept its argument, somehow made with a straight face, that because the clerk received the transmittal from the prison on April 25, Henderson did not place it in the hands of the prison officials until the day before, to-wit April 24; that in a herculean burst of bureaucratic efficiency and postal service it was processed by the various levels of prison administration and delivered to the rural post office in Huntingdon, Pennsylvania that same day; that in lightning speed, the U.S. Postal Service carried it from Central Pennsylvania over the mountains to the Pittsburgh metropolitan distribution center--covering half the distance of the state--where, without any delay whatsoever, it was delivered to the district court clerk's office in Pittsburgh by the next morning. If the Commonwealth had introduced evidence to support this ambitious scenario, it might have received some favorable reception here. But no such evidence was submitted. And what we know as men and women about prison administrative procedures and the pace of U.S. Mail delivery, now described as "snail mail" by e-mail aficionados, we must not forget as judges. We will not accept the Commonwealth's theory that we should employ a kind of judicial notice to accept its theory.

We recognize that "prison authorities are in a position to easily show when a document was received or mailed under established prison procedures for recording the date and time at which papers are received by prison officials in the prison's mail room." Flanagan, 999 F.3d at 757 (citing Houston, 108 S. Ct. at 2384). Thus, the Commonwealth should have been expected to support its untimeliness argument with prison logs documenting that Henderson deposited his Petition with prison authorities on April 24 or April 25, 1996. Absent such proof to the contrary, we conclude that Henderson's Petition, having arrived in Pittsburgh on April 25, must have been first delivered to prison authorities some time before April 24, and therefore should be deemed filed before the AEDPA effective date.

6

Because the AEDPA does not apply here, the one-year period of limitations of the amended S 2244(d) does not bar the Petition.1 We repeat that, in this case, the Commonwealth had the burden of proving that the Petition had been delivered to prison authorities on April 24 and not before. It not only failed to meet its burden, it did not even see fit to raise this issue in the district court.

III.

A federal court may not grant a writ of habeas corpus unless (1) "the applicant has exhausted the remedies available in the courts of the State", (2) no such state remedy is available or (3) available remedies are ineffective to protect the applicant's rights. 28 U.S.C. S 2254(b)(1). To exhaust the remedies available in the Pennsylvania courts, Henderson must first fairly present to the Pennsylvania courts all claims he will make in his Habeas Petition, in order to give the state courts "the `opportunity to pass upon and correct alleged violations of [his] federal rights.' " See Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). Henderson raised one issue in his Petition to the district court: "Petitioner did not knowingly and intelligently waive his Sixth Amendment Right to Counsel." For Henderson to have "fairly presented" this issue to the Pennsylvania courts, his "state court pleadings and briefs must demonstrate that he has presented the legal theory and supporting facts asserted in the federal habeas petition in such a manner that the claims raised in the state courts are substantially equivalent to those asserted in federal court." See Doctor, 96 F.3d at 678 (quotation omitted).

The record clearly demonstrates that Henderson, following his conviction, "fairly presented" before each level of state court hierarchy the issue of the effectiveness of his waiver of counsel on his subsequent pro se representation at the suppression hearing. App. at 56, 61 (Superior Court

_____

1. Even if the AEDPA applied here, S 2244(d) would not time-bar Henderson's Petition because, as this Court recently held, habeas petitions need only be filed before April 24, 1997 to be timely under the new standard. See Burns, 134 F.3d at 111.

7

of Pennsylvania); id. at 363 (Supreme Court of Pennsylvania); id. at 85 (Common Pleas Court of Greene County). Moreover, the Commonwealth conceded to the district court in its Answer to Henderson's Habeas Petition that "[t]he petitioner has exhausted his state remedies as to the issue of his right to counsel at the suppression hearing, albeit under the guise of an assertion of ineffective assistance of counsel." App. at 23.

Notwithstanding the district court's rather detailed analysis of the nuances of exhaustion--it construed Henderson's Petition as raising two Sixth Amendment violations, one at the preliminary hearing and another at the suppression hearing, and conducted a separate exhaustion analysis for each--we are satisfied that Henderson has fulfilled the exhaustion requirement. The Supreme Court has warned that judges should not misread habeas petitions in order to split single claims and conduct separate exhaustion analyses for each. Engle v. Isaac, 456 U.S. 107, 124 n.25 (1982) ("A creative appellate judge could almost always distill from these allegations an unexhausted . . . claim."). We read the record to indicate that Henderson was without counsel at only one critical stage of his criminal proceeding--the suppression hearing. His right to counsel at this juncture certainly could have been waived, but it is the government's burden to demonstrate that such a waiver was voluntary, knowing and intelligent. See Brewer v. Williams, 430 U.S. 387, 403 (1977). That the waiver analysis in this case involves two pieces of evidence at two different times--a waiver form signed by Henderson at the preliminary hearing and his motion to proceed pro se filed before the suppression hearing--does not transform the single, alleged constitutional deprivation into two separate ones.

Any doubt that Henderson raised only a single claim before the state courts and again in his Habeas Petition is answered by Henderson's Habeas Petition itself, which states as the single, simple ground for review,"Petitioner did not knowingly and intelligently waive his Sixth Amendment Right To Counsel." App. at 11. We reject the Commonwealth's attempt to split the claim for exhaustion purposes--right to counsel at the preliminary hearing and

8

right to counsel at the suppression hearing--because it was the Commonwealth that broached the issue, notwithstanding Henderson's simple statement of the issue presented. See McMahon v. Fulcomer, 821 F.2d 934, 941 (3d Cir. 1987). The legal memorandum Henderson submitted in support of his Petition clarified any ambiguity the district court may have had when he wrote of his "single constitutional issue" that "[t]he legal claim of invalid waiver of counsel at the preliminary hearing is precisely the same as invalid waiver of counsel at the suppression hearing."

What we said in McMahon, 821 F.2d at 941, may be reiterated to control the present matter:

> Though appellant's petition may have been inartfully drafted, it was the Commonwealth, not the petitioner, that construed it as containing more than one claim. We find the record below reveals that [Henderson] clarified any ambiguity with respect to the Petition for a Writ of Habeas Corpus and adequately informed the court that the Petition contained only one issue.

Accordingly, we conclude that Henderson properly exhausted the issue of his right to counsel at the suppression hearing. We turn, then, to the merits of his Petition.[2]

IV.

The Sixth Amendment provides, inter alia:"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI; see Bey, 124 F.3d at 528. The right to counsel attaches at arraignment, extends through the first appeal and guarantees an accused the assistance of counsel at all critical stages of a proceeding. Michigan v. Harvey, 494 U.S. 344, 357 (1990). A pretrial hearing considering the suppression of the defendant's confession is such a critical stage because its "results might settle the accused's fate

_____

2. Because we concluded in Part II supra that the AEDPA does not apply to this Petition, we exercise plenary review over the state court judgment.
See Bey, 124 F.3d at 528.

9

and reduce the trial itself to a mere formality." See id. at 358 n.5 (quoting United States v. Wade, 388 U.S. 218, 224 (1967)).

Concomitant with the right to be defended by counsel during criminal proceedings is the accused's right to waive counsel and proceed pro se. Faretta v. California, 422 U.S. 806, 821 (1975). In order to establish that Henderson validly waived his right to counsel, the Commonwealth bears the heavy burden of proving that the waiver was voluntary, knowing and intelligent. See Brewer, 430 U.S. at 403. The district court determined that Henderson validly waived his right to counsel, relying on (1) the waiver form which Henderson signed and filed with the district justice at the preliminary hearing and (2) the "Petition to Proceed on own Behalf " which Henderson filed pro se with the Court of Common Pleas before the suppression hearing.

We conclude, however, that these documents alone--the generic waiver form unspecific to Henderson's case and a Petition which states, almost exclusively, "I wish to proceed on my own behalf "--are insufficient to meet the Commonwealth's "weighty obligation . . . to prove an intentional relinquishment or abandonment of a known right or privilege." App. at 33, 35; see Brewer, 430 U.S. at 403-404.

To ensure that an accused is aware of the pitfalls possible in self-representation, "the district court should advise him in unequivocal terms both of the technical problems he may encounter in acting as his own attorney and of the risks he takes if his defense efforts are unsuccessful." See United States v. Welty, 674 F.2d 185, 188 (3d Cir. 1982). As a matter of constitutional law, we have imposed a clear and unambiguous obligation upon a trial judge who is faced with an accused who states merely that he is aware of his right to counsel but wishes to waive that right. A statement by a defendant that he wishes to proceed pro se is not enough. Signing a pre-printed form is not enough. See Piankhy v. Cuyler, 703 F.2d 728, 731 n.4 (3d Cir. 1983). Whether it be a U.S. District Judge or a U.S. Magistrate Judge in a federal prosecution or a state judge in a state criminal proceeding, the trial judge must conduct a colloquy with the accused to determine that the waiver is

10

not only voluntary, but also knowing and intelligent. Id. At a minimum,

> [t]o be valid [a defendant's] waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

Id. at 188–189 (quoting Von Moltke v. Gillies, 332 U.S. 708, 724 (1948) (plurality opinion) (reversing denial of habeas petition because standard, pre-printed waiver of counsel form insufficient to satisfy Sixth Amendment)). We have held that an accused's protection under the Sixth Amendment Right to Counsel is not satisfied when a trial judge has failed to conduct "a penetrating and comprehensive examination" of the accused's waiver attempt which ensures that the accused is knowledgeable about his decision, even when the colloquy skips just one of the above factors. See Welty, 674 F.2d at 189 (no waiver where court merely informed defendant that self-representation is "inadvisable") (quoting Von Moltke, 332 U.S. at 724 (plurality opinion)); see also United States v. Moskovits, 86 F.3d 1303, 1308 (3d Cir. 1996) (no waiver notwithstanding trial judge's detailed colloquy with defendant because judge failed to state that he was authorized to impose greater sentence than that imposed in defendant's first trial).

In this case, neither the waiver of counsel form nor the petition to proceed pro se explained, for example, what sentences or fines Henderson could face if convicted, nor did they demonstrate Henderson's understanding of "all other facts essential to a broad understanding of the whole matter." See Welty, 674 F.2d at 189 (quoting Von Moltke, 332 U.S. at 724 (plurality opinion)); see also United States v. Salemo, 61 F.3d 214, 222 (3d Cir. 1995) (invalid waiver where no recorded colloquy, notwithstanding trial judge's apparent familiarity with defendant's understanding of legal issues in case). As a plurality of the Supreme Court described in Von Moltke, 332 U.S. at 724, "a mere routine inquiry--the asking of several standard questions followed

11

by the signing of a standard written waiver of counsel-—may leave a judge entirely unaware of the facts essential to an informed decision that an accused has executed a valid waiver of his right to counsel." A generic waiver form such as Henderson's cannot replace the verbal colloquy between judge and defendant, set forth for the record, to satisfy the judge's obligation to ensure a waiver is made voluntarily, knowingly and intelligently. See Singer v. Court of Common Pleas, 879 F.2d 1203, 1210 (3d Cir. 1989). We therefore conclude that Henderson did not make a valid waiver of his right to counsel at the suppression hearing.

The writ of habeas corpus should have been granted.

V.

But this does not end our deliberation. The Commonwealth urges that if we issue the writ it should be conditioned upon the Commonwealth affording Henderson only the opportunity for a new suppression hearing, and then conducting a new trial only if his confession is suppressed. Henderson suggests otherwise. He argues that he should be entitled to not only a new suppression hearing but also a new trial before a jury, regardless of the outcome of the suppression hearing. To determine what conditions should be attached to the grant of the writ, it isfirst necessary to determine if we have the authority to condition the release on any proceeding less than a new trial, and if so, we must decide if we should exercise that authority under the circumstances of this case. We begin our analysis by addressing the precise nature of federal court habeas corpus jurisdiction over petitions emanating from criminal convictions in the state court system.

A.

Let there be no misunderstanding that federal habeas corpus review of state criminal convictions is an anomaly in the jurisprudence of res judicata. It is only in the context of a state criminal proceeding that a state court determination of federal constitutional law may be reexamined anew in the federal court system. Thus, where a federal constitutional issue is presented to the state court

system in a civil action in a proceeding brought under 42 U.S.C. S 1983, the Supreme Court has held that Congress did not intend "to allow relitigation of federal issues decided after a full and fair hearing in a state court simply because the state court's decision may have been erroneous." Allen v. McCurry, 449 U.S. 90, 101 (1980). Although the writ of habeas corpus is a civil proceeding, at least since 1953 the Court has considered it a special exception to this rule. Thus in Brown v. Allen, 344 U.S. 443, 500 (1953), Justice Frankfurter, speaking for the majority, wrote, "the prior State determination of a claim under the United States Constitution cannot foreclose consideration of such a claim, else the State court would have the final say which Congress, by the Act of 1867, provided it should not have." Also speaking for the majority, Justice Reed stated,"[t]he state adjudication carries the weight that federal practice gives to the conclusion of a court of last resort of another jurisdiction on federal constitutional issues. It is not res judicata." Id. at 458.

If there was difficulty trying to reconcile the philosophy of the Brown v. Allen Court in 1953 with the Allen v. McCurry Court in 1980, Justice Brennan, speaking for the Court in 1963 in Fay v. Noia, 372 U.S. 391, 430 (1963), carved out a sound jurisdictional basis for the present concept of federal habeas corpus, stating that, "while our appellate function is concerned only with the judgments or decrees of state courts, the habeas corpus jurisdiction of the lower federal courts is not so confined. The jurisdictional prerequisite is not the judgment of a state court but detention simpliciter." Therein Justice Brennan emphasized that "[h]abeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him. Indeed, it has no other power; it cannot revise the state court judgment; it can act only on the body of the petitioner." Id. at 430-431.

With this understanding, and conscious that we are not reviewing in ipsis verbis the state court decision but only inquiring into detention simpliciter, we lack the ability to "revise the state court judgment." It would seem that federal habeas power is limited, first, to a determination of whether there has been an improper detention by virtue of

13

the state court judgment; and second, if we find such an illegal detention, to ordering the immediate release of the prisoner, conditioned on the state's opportunity to correct constitutional errors that we conclude occurred in the initial proceedings. This is not a direct appeal from a federal conviction, where upon vacating the judgment this Court would have unlimited power to attach conditions to the criminal proceedings on remand. See, e.g., United States v. Gravatt, 868 F.2d 585, 591 (3d Cir. 1989). Rather, this is federal habeas corpus relating to a state conviction.

B.

Our relief must thus be fitted between two principles underlying habeas corpus jurisprudence. The first is found in the habeas statute itself: "The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. S 2243. The second is that "[b]oth the historic nature of the writ and principles of federalism preclude a federal court's direct interference with a state court's conduct of state litigation." See Barry v. Brower, 864 F.2d 295, 300 (3d Cir. 1988). Within the strictures of these principles, federal courts have most often granted the relief in habeas cases that has required the least intervention into the state criminal process. Courts usually condition the issuance of a writ, which releases the body of the prisoner from custody obtained through unconstitutional means, upon the state's failure to retry the habeas petitioner within a reasonable time in a way that comports with constituional dictates. See, e.g., Brewer, 430 U.S. at 407 n.13.

It is true that under certain circumstances, federal courts have conditioned the issuance of a writ on the state's conducting proceedings narrower than a full retrial. See Jackson v. Denno, 378 U.S. 368, 394 (1964) (conditioning writ on state court conducting evidentiary hearing to decide whether petitioner's confession was voluntary or coerced and thus inadmissible at trial, a decision which the state court had left for the jury to make in contravention of the petitioner's due process rights in the state trial; further ordering that if the state court decides the confession was coerced, then a new trial would be necessary to avoid the

14

writ). However, such cases make clear that conditional writs must be tailored to ensure that all constitutional defects will be cured by the satisfaction of that condition. The Supreme Court "has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court." Hilton v. Braunskill, 481 U.S. 770, 775 (1987) (emphasis added). This Court certainly has the power to condition the writ on a new trial. Before we further parse the relief and limit the condition to a suppression hearing alone, we must examine the nature of the constitutional violation found here in order to be sure that simply conducting the new hearing will completely eradicate the violation, and to be sure we do not "revise the state court judgment." See Faye, 372 U.S. at 431.

C.

The right to the assistance of counsel granted in the Sixth Amendment, including the "correlative right to dispense with a lawyer's help", Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942), is "one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty", Johnson v. Zerbst, 304 U.S. 458, 462 (1938). This constitutional right "withholds from federal courts [and from state courts via the Fourteenth Amendment, Gideon v. Wainwright, 372 U.S. 335, 345 (1963)], in all criminal proceedings, the power and authority to deprive an accused of his life or liberty unless he has or waives the assistance of counsel." Johnson, 304 U.S. at 463. Had Henderson been deprived of his right to counsel at the trial itself, certainly we would require no less than a new trial to prevent a writ from issuing. We must decide, however, whether the deprivation of counsel at Henderson's suppression cast enough taint on the counseled trial itself that we must condition the writ on a new trial. We conclude that it did.

This case must first be distinguished from those in which a constitutional violation in the state criminal proceedings could be corrected by issuing a writ conditioned on something less than a whole trial--a hearing, for example.

15

In Jackson, 378 U.S. at 377, 394, the Supreme Court held unconstitutional a state criminal trial procedure in which a judge was not given the discretion to exclude a defendant's confession if a "fair question" existed about its voluntariness. Giving the jury the primary responsibility to first determine whether the confession was voluntary, and second, to discredit involuntary confessions which the jury has at that point already heard, violated due process. Id. at 377. In fashioning a remedy, the Court recognized that the defendant was entitled to a hearing in which the voluntariness, and hence admissibility, of his confession would be determined apart from "the body trying guilt or innocence." Id. at 394. The Court concluded:

> So far we agree and hold that he is now entitled to such a hearing in the state court. But if at the conclusion of such an evidentiary hearing in the state court on the coercion issue, it is determined that Jackson's confession was voluntarily given, admissible in evidence, and properly to be considered by the jury, we see no constitutional necessity at that point for proceeding with a new trial, for Jackson has already been tried by a jury with the confession placed before it and has been found guilty.

In that case, because the constitutional violation suffered by the habeas petitioner was the lack of a necessary hearing, the Court could remedy that defect by ordering a constitutional hearing itself. It was the legal outcome of that hearing alone--a determination about the voluntariness of the confession--that was important. Because it had been missing, the Court was able to "dispose of the matter as law and justice require," 28 U.S.C. S 2243, by granting the narrow relief of ordering the hearing itself.

However, the nature of the constitutional violation suffered by Henderson is very different than that in Jackson. To be sure, the Court there stated that no new trial was necessary "for Jackson has already been tried by a jury with the confession placed before it and has been found guilty." Jackson, 378 U.S. at 394. But the linchpin of the Court's decision in Jackson, and the sole issue argued and decided there, was not the Sixth Amendment Right to

16

Counsel present in this case, but a determination that "a conviction based upon a coerced confession . . . cannot withstand constitutional attack under the Due Process Clause of the Fourteenth Amendment." Id. at 377. There is a completely different issue presented here, and it is one that requires a completely different analysis. When Henderson was deprived of his Sixth Amendment Right to Counsel at the suppression hearing, he lost much more than an opportunity to have his confession suppressed-- the legal outcome of that hearing. Rather, the constitutional defect he suffered in the first suppression hearing was a procedural, structural defect which may have had repercussions in plea bargaining, discovery and trial strategy that would not be cured by a new suppression hearing alone. This is a much more sophisticated right and its analysis must always begin where the due process determination leaves off.

The importance of "the guiding hand of counsel at every step in the proceedings against him," Powell v. Alabama, 287 U.S. 45, 69 (1932), cannot be understated. First, representation by counsel in the stages leading up to trial is beneficial to the defendant who may wish to pursue his plea bargaining options and avoid trial altogether. See Grades v. Boles, 398 F.2d 409, 413 (4th Cir. 1968) ("Counsel, or effective waiver thereof, is a sine qua non of permissible plea bargaining."). Second, "trained counsel can more effectively discover the case the State has against his client and make possible the preparation of a proper defense to meet that case at the trial." See Coleman v. Alabama, 399 U.S. 1, 9 (1970). Third, "the skilled interrogation of witnesses [at a pretrial hearing] by an experienced lawyer can fashion a vital impeachment tool for use in cross-examination of the State's witnesses at the trial, or preserve testimony favorable to the accused of a witness who does not appear at the trial." Id. Particularly here, where three of the four witnesses to testify at the suppression hearing testified at Henderson's trial, see App. at 159, 213, the participation of a skilled attorney at both proceedings certainly would have been beneficial to Henderson's ultimate defense. Henderson suffered a constitutional deprivation that went to the heart of the criminal trial process itself, a violation which cannot be

17

remedied by merely ordering a new suppression hearing and conditioning a new trial on its sheer outcome alone. Cf. Waller v. Georgia, 467 U.S. 39, 47–50 (1984) (in non–habeas case reviewing state criminal convictions, where defendants failed to have wiretap evidence suppressed in a closed pretrial hearing that violated the Sixth Amendment's public trial guarantee and were convicted at trial, the Court remanded for new suppression hearing only; however, the Court stressed that the outcome of such hearings often replaced the importance of the trial itself and the Court did not indicate any way in which the procedure and conduct of the suppression hearing, other than its sheer outcome alone, would affect the trial or any other part of the proceedings in that case).

Moreover, the value of counsel to Henderson at the hearing must be underscored because the hearing concerned what was undoubtedly the most damaging piece of evidence offered against Henderson at trial: his confession. Of course, that Henderson failed to have his confession suppressed in no way precluded his attack on the credibility of the confession at trial. See Crane v. Kentucky, 476 U.S. 683, 690 (1986). The judge may not have ruled as a matter of law that the confession was inadmissible, but had a skilled attorney represented Henderson at the suppression hearing, he or she would have confronted the witnesses against Henderson and studied the Commonwealth's trial strategy, in the hopes of preparing a better attack on the factual environment of the confession at a trial by jury. See id. at 691; Dancy v. United States, 361 F.2d 75, 77 (D.C. Cir. 1965) ("defense counsel's conduct of the cross–examination of witnesses at the trial reflects a tentative and probing approach due to his ignorance of certain doubtful areas in the government's proof which might well have been known to him had he been able to participate in the preliminary hearing").

D.

Finally, we decide that the deprivation of Henderson's right to counsel at the suppression hearing is one of the "structural defects in the constitution of the trial mechanism, which defy analysis by `harmless–error'

18

standards." See Arizona v. Fulminante, 499 U.S. 279, 309 (1991); see also Salemo, 61 F.3d at 221-222 (refusing to conduct harmless error analysis to Sixth Amendment violation at sentencing hearing); United States v. Allen, 895 F.2d 1577, 1580 (10th Cir. 1990) (harmless error analysis inapplicable to waiver of counsel cases); United States v. Bohn, 890 F.2d 1079, 1082 (9th Cir. 1989) (harmless error analysis inappropriate when defendant denied right to counsel at in camera hearing).3 The existence of structural defects, including deprivation of the right to counsel at the trial itself, "requires automatic reversal of the conviction because they infect the entire trial process." Brecht v. Abrahamson, 507 U.S. 619, 629-630 (1993). On the other hand, mere "trial errors," which usually "occur during the presentation of the case to the jury," are "amenable to harmless-error analysis" because they "may . .. be quantitatively assessed in the context of other evidence presented in order to determine [the effect they had on the trial]." Id. at 629 (quoting Fulminante, 499 U.S. at 307-308).

Violations of the right to counsel may not always be structural defects which allow a reviewing court to bypass harmless error analysis, see Sullivan v. Louisiana, 508 U.S. 275, 282-283 (1993) (Rehnquist, C.J., concurring), but harmless error analysis should never be applied where, as here, "deprivation of the right to counsel affected--and contaminated--the entire criminal proceeding", Satterwhite v. Texas, 486 U.S. 249, 257 (1988). We are convinced that the absence of counsel at Henderson's suppression hearing, which handicapped Henderson during the remainder of the proceedings against him and especially injured his attorney's ability to argue the facts of his confession to the jury at trial, contaminated the entire criminal proceeding in this case. See United States v. Cronic, 466 U.S. 648, 659

_____

3. But see United States v. Mills, 895 F.2d 897, 904 (2d Cir. 1990) (even though defendant suffered right to counsel violation when denied opportunity to make closing argument pro se in hearing to suppress defendant's incriminating statements, violation was harmless error because, after motion to suppress was denied, government did not introduce statements at trial); Richardson v. Lucas, 741 F.2d 753, 757 (5th Cir. 1984) (even if waiver of counsel was invalid, error was harmless).

19

n.25 (1984) ("The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."). The effect of this determination is that prejudice is presumed by the fact of the constitutional error itself.

E.

The sum of these factors--that the deprivation of counsel from Henderson's suppression hearing was a procedural, structural defect, that Henderson has the right to introduce facts at trial in an effort to attack the credibility of the confession and the impropriety of a harmless error analysis here--leads us to conclude that the constitutional violation suffered by Henderson will not be corrected absent a new trial.

Moreover, we repeat for emphasis that the conclusion we reach today does not run counter to the teachings of the Supreme Court or prior decisions of this court. First, the views stated here do not conflict with the holding or teachings of Jackson v. Denno, which did not address the Sixth Amendment Right to Counsel but discussed only a due process violation. The full guarantee of the Sixth Amendment gives the defendant the right to make proper preparation for trial on the basis of testimony adduced at the suppression hearing, irrespective of the outcome of the hearing, a constitutional issue that was neither argued nor decided by the Court in Jackson. In contrast to the jury in Jackson, which arguably knew too much (and was harmed by what it knew), the jury in this case had too little information. What is at stake here is the opportunity of counsel to utilize at a subsequent trial any information he may have obtained at the suppression hearing. Nor do we think that our view is contrary to the teachings and holdings of cases in this court. For example, in United States ex rel. Harvin v. Yeager, 428 F.2d 1354, 1358-1359 (3d Cir. 1970), United States ex rel. Montgomery v. Brierley, 414 F.2d 552, 560 (3d Cir. 1969), and United States ex rel. Dickerson v. Rundle, 363 F.2d 126, 130 (3d Cir. 1966), we found due process violations where each state prisoner was denied a Jackson hearing. We have already decided that

20

due process requires a very different analysis than the correction of a Sixth Amendment deprivation. Moreover, in Yeager, 428 F.2d at 1359, we conditioned the writ on a new Jackson hearing in which the state court would decide whether the prisoner's statement at issue was voluntary and hence admissible, but stated that even if the state courts "hold the statement admissible, they may still consider the possibility of granting a new trial, especially if there is any substantial difference between the evidence presented at the new hearing and that which had been submitted to the jury at the trial."

Second, in no way do we ignore the teachings of Brecht, 507 U.S. at 637, which mandates that habeas relief be used only "to afford relief to those whom society has`grievously wronged' " and not when there is a mere "reasonable possibility" of harm to the petitioner. Here, we have not suggested a mere possibility that the verdict was tainted by constitutional error; we have found a real constitutional error--to wit, a violation of the Sixth Amendment Right to Counsel--one that substantially undermines our confidence in the reliability of the trial.

Third, we do not disregard the teachings of Waller, 467 U.S. at 50, where the defendant was given a suppression hearing that was closed to the public in violation of the Sixth Amendment's guarantee of a public trial. Obviously, the violation in that case was easily cured by ordering a new public suppression hearing. In this case, the Sixth Amendment Right to Counsel will simply not be cured by ordering a new suppression hearing alone because the effect of the constitutional error spilled over into the trial itself.

Therefore, although we possess the power to attach conditions other than according a successful habeas petitioner a new trial, we should not do so here. We are not prepared to rule as a matter of law that a lawyer who represents a defendant at an unsuccessful suppression hearing will always be unable, as a result of that hearing, to uncover facts or develop strategy that will ultimately benefit his or her client at trial. Holding that Henderson is entitled only to a new suppression hearing and not a new trial would be to rule just that. If the confession is not

21

suppressed after a new hearing, all that will have been decided is that there was no illegality in the Commonwealth's obtaining the confession. This ruling of law would not deny the defendant's right to raise questions of fact and credibility to the jury relating to the putative confession. This is the opportunity that the Sixth Amendment guarantees a criminal defendant in a "trial, by an impartial jury of the State and district wherein the crime shall have been committed". U.S. Const. amend. VI. It is for efforts like this that the same Amendment affirms and attests his right "to have the Assistance of Counsel for his defence."

* * * * * * * *

We have considered all contentions of the parties and have concluded that no further discussion is necessary.

The judgment of the district court will be reversed and the proceedings remanded to the district court for entry of a writ of habeas corpus, which shall be conditioned upon the Commonwealth affording petitioner a new hearing on his motion to suppress his confession and, if the Commonwealth still wishes to pursue the charges, a new trial that will abide the decision reached following the suppression hearing.

22

GARTH, Circuit Judge, dissenting:

I agree with the majority of the court that: (1) the AEDPA does not apply in this case, (2) Henderson has exhausted his claims, (3) the uncounseled suppression hearing 949<!>conducted by the Court of Common Pleas violated

Henderson's constitutional rights, and (4) we are therefore obliged to order the district court to issue the writ of habeas corpus. I part company with the panel majority on the one substantial issue in this appeal: the remedy that must be afforded Henderson "to correct the constitutional violation found by the court." Hilton v. Braunskill, 481 U.S. 770, 775 (1987). Because I feel strongly that the majority's analysis is deeply flawed on this point, I feel compelled to dissent and to explain my views in some depth.

The majority of the panel holds that the writ to be issued must grant Henderson a new trial, even though neither Henderson nor the panel majority claims that the constitutional defect at issue extended beyond the uncounseled suppression hearing to the trial itself. I, on the other hand, relying on Supreme Court and Third Circuit authority, would hold that the writ should be conditioned only on the grant of a counseled and therefore constitutional suppression hearing.

I reach this conclusion because the Supreme Court so held in Jackson v. Denno, 378 U.S. 368 (1964). In Jackson, the Supreme Court ruled 5 to 4 that, because a new suppression hearing could cure the constitutional wrong entirely and minimized the federal intrusion into state sovereignty, the habeas writ need only direct that a new suppression hearing be held to determine whether the confession was voluntary. Thus, a new trial was not required. See id. at 394–95. The Supreme Court has stood by this rule. See, e.g., Sims v. Georgia, 385 U.S. 538, 544 (1966). Our court has applied the rule in several cases as well, and has in each case limited the habeas relief to a new suppression hearing to determine whether the confession was in fact voluntary. See, e.g., United States ex rel. Harvin v. Yeager, 428 F.2d 1354, 1358–59 (3d Cir. 1970) (ordering district court to issue writ conditioned on grant of suppression hearing); United States ex rel. Montgomery v. Brierley, 414 F.2d 552, 560 (3d Cir. 1969)

23

(same); United States ex rel. Dickerson v. Rundle, 363 F.2d 126, 130 (3d Cir. 1966) (same).

Today the majority has veered away from this well-established line of cases. In the view of the panel majority, a suppression hearing alone is insufficient because it would not completely cure the constitutional wrong, and because it might unduly interfere with state sovereignty. Maj. Op. at 15-22.

Absent Jackson and its progeny, I would still disagree with the majority. Awarding Henderson a new trial in the event that his confession is once again ruled admissible "provide[s] a totally unjustifiable windfall to a petitioner who has not been injured by the actions of which[ ]he complains." Koski v. Samaha, 648 F.2d 790, 798 (1st Cir. 1981). After all, Henderson has not challenged the constitutional adequacy of his trial, at which he testified to the circumstances surrounding his confession. Granting Henderson a bonus new trial based on the "possibility" that constitutional error might have contributed to his trial even if his confession were properly admitted "is at odds with the historic meaning of habeas corpus." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Because the Supreme Court has already rejected the majority's argument in Jackson, however, I am compelled to raise a much more serious objection. I believe that the majority's efforts to finesse and distinguish Jackson v. Denno is a complete derogation of Supreme Court authority. Supreme Court judgments are always superior to our own. Because the Supreme Court has already considered and rejected the view that the Constitution requires a new trial to be granted in such circumstances, and our court has faithfully applied these precepts before in several cases, I believe the majority's resolution of this case is contrary not only to good sense, but established law. Its fanciful speculation as to the impact that Henderson's unconstitutional suppression hearing might have had on his trial has unjustifiably disregarded both state prerogatives and the jurisprudence of both the Supreme Court and the Third Circuit.

Under Jackson v. Denno, Henderson is constitutionally entitled to no more than a counseled suppression hearing.

24

If his motion to suppress is again denied, that ends it. "Of course, if the state court, at an evidentiary hearing, redetermines the facts and decides that [Henderson]'s confession was involuntary, there must be a new trial on guilt or innocence without the confession's being admitted in evidence." Jackson, 378 U.S. at 394. Because the majority has refused to recognize the Supreme Court's teaching, I dissent from the remedy afforded to Henderson by the court.

A.

Jackson v. Denno

In Jackson v. Denno, the Supreme Court invalidated a New York criminal procedure by which the voluntariness of confessions was submitted to the jury with appropriate instructions. The habeas petitioner in that case, Jackson, had been charged with murder and had confessed in circumstances indicating that the confession might have been involuntary. Following New York procedure, the state trial judge admitted the confession in evidence at trial. Jackson then took the stand in his defense and recounted the circumstances of his confession. He was then cross-examined by the prosecution. Following closing arguments, the trial court submitted the issue of the confession's voluntariness to the jury. The jury was told that"if it found the confession involuntary, it was to disregard it entirely, and determine guilt or innocence solely from the other evidence in the case; alternatively, if it found the confession voluntary, it was to determine its truth or reliability and afford it weight accordingly." 378 U.S. at 374-75.

The Supreme Court, per Justice White, invalidated the procedure on the basis that the New York procedure did not adequately safeguard the defendant's "right to be free of a conviction based upon a coerced confession." Id. at 377. The problem, quite simply, was that juries were likely to believe that even coerced confessions were truthful. Accordingly, jurors were likely to convict defendants on the basis of coerced confessions despite the instruction to disregard such confessions. See Watkins v. Sowders, 449

25

U.S. 341, 347 (1981) (discussing Jackson). The Court concluded that the procedure's failure to provide"a reliable determination of the voluntariness of the confession" meant that it could not "withstand constitutional attack under the Due Process Clause of the Fourteenth Amendment." Jackson, 378 U.S. at 377.

The Court then turned to the proper remedy, and confronted the issue that divides the panel today. The issue was this: when a state conviction is based on a confession that was admitted in evidence pursuant to a constitutionally flawed procedure, does the Constitution require a federal habeas court to enter a writ conditioned on an entirely new trial, or merely a writ conditioned on the state conducting a proper suppression hearing?

A majority of the Supreme Court chose the latter. Justice White, writing for the majority, agreed that the habeas petitioner was entitled to "an adequate [suppression] hearing productive of reliable results concerning the voluntariness of the confession." Id. at 394. However, he wrote, "[i]t does not follow . . . that Jackson is automatically entitled to a complete new trial including a retrial of the issue of guilt or innocence." Id. According to Justice White:

> [I]f at the conclusion of such an evidentiary hearing . . . it is determined that Jackson's confession was voluntarily given, admissible in evidence, and properly to be considered by the jury, we see no constitutional necessity at that point for proceeding with a new trial, for Jackson has already been tried by a jury with the confession placed before it and has been found guilty. . . . [W]e cannot say that the Constitution requires a new trial if in a soundly conducted collateral proceeding, the confession which was admitted at the trial is fairly determined to be voluntary.

Id. at 394-96 (emphasis added). If the confession was in fact voluntary, the Court held, a new trial was not required because the state's procedure would have created"no constitutional prejudice" to the defendant: "If the jury relied on [the voluntary confession], it was entitled to do so." Id. at 394. "Obviously, the State is free to give Jackson a new trial if it so chooses," Justice White added,"but for us to

26

impose this requirement before the outcome of the new hearing on voluntariness is known would not comport with the interests of sound judicial administration and the proper relationship between federal and state courts." Id. at 395 (emphasis added).

In separate dissents, Justice Black and Justice Clark each attacked the majority's conclusion that a new suppression hearing was sufficient to correct the constitutional violation. According to Justice Clark, a suppression hearing alone "d[id] not cure the error which the Court finds present." Id. at 426 (Clark, J., dissenting). Justice Black agreed, deeming the court's remedy a "fragmentizing" device that had improperly succeeded in "sustaining convictions and denying defendants a new trial where all the facts are heard together." Id. at 410 (Black, J. dissenting).

B.

Henderson v. Frank

The habeas petitioner in this case, John Henderson, was also charged with a crime and confessed in circumstances that raised the possibility that the confession was coerced. Like Jackson, Henderson was unconstitutionally denied "an adequate evidentiary hearing productive of reliable results concerning the voluntariness of his confession." Jackson, 378 U.S. at 394. In Henderson's case, his hearing was inadequate because his right to the assistance of counsel, a constitutional right "essential to a fair trial," Gideon v. Wainright, 372 U.S. 335, 342 (1963), was denied. As was the case with Jackson, Henderson's confession was nonetheless admitted in evidence at trial, where Henderson was represented by counsel.[1] Like Jackson, Henderson took the stand in his own defense at trial and explained to the jury that his confession was coerced.[2]  Like Jackson,

_____

[1] As noted, Henderson has not challenged the constitutionality of his trial.

[2] Henderson told the jury that the officers handcuffed him to a chair, threatened him, told him what to write down in the confession, and failed to read Henderson his Miranda rights. App. 303-06 (trial transcript).

Henderson was then cross-examined by the prosecution. App. 316. As was the case in Jackson's trial, the trial judge in Henderson's case instructed the jury "that you must disregard the confession or the statement unless you are satisfied by a preponderance of the evidence . . . that the defendant made the statement voluntarily. . . . If you find that the defendant made the statement voluntarily, .. . then you may consider it as evidence against him." App. 341-42. Like Jackson, Henderson was found guilty.

The majority of this court has properly concluded that Henderson's constitutional right to the assistance of counsel was violated when he was permitted to proceed in his suppression hearing pro se without adequate waiver of counsel. See Maj. Op. 9-12. In holding that the right to the assistance of counsel was so fundamental to a fair trial that it was guaranteed to state defendants by the Due Process clause of the Fourteenth Amendment, the Supreme Court in Gideon described the intolerable unreliability of uncounseled proceedings:

> If charged with crime, [the layman] is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

Gideon, 372 U.S. at 345 (quoting Powell v. Alabama, 287 U.S. 45, 68-69, 53 S. Ct. 55, 64 (1932)). The panel majority properly follows our precedent in determining that the trial judge's failure to ensure that Henderson adequately waived his right to counsel violated those same rights, and permitted Henderson to engage in a critical suppression hearing without "the skill and knowledge adequately to prepare his defense." Id. That failure denied Henderson that

28

"to which he is constitutionally entitled--an adequate evidentiary hearing productive of reliable results concerning the voluntariness of his confession," Jackson, 378 U.S. at 394--much like Jackson.

Where the majority diverges from precedent is in its determination of the proper remedy. Instead of following Justice White's majority opinion in Jackson v. Denno, the panel majority sides with the dissenting Justices in that case and rules that the Constitution requires our court to order a writ conditioned on the grant of an entirely new trial, rather a writ conditioned on the grant of a suppression hearing alone. The panel majority offers two reasons for its conclusion, both of which were categorically rejected by the Supreme Court in Jackson.

First, the panel majority adopts Justice Clark's dissent and rules that a new trial is required because "merely to have the trial judge hold a hearing on the admissibility of the confession . . . does not cure the error which the Court finds present." Jackson, 378 U.S. at 426 (Clark, J., dissenting). The panel majority reasons that if a proper (counseled) suppression hearing had been held, it might have had "repercussions in plea bargaining, discovery and trial strategy that would not be cured by a new suppression hearing alone." Maj. Op. at 17. "[H]ad a skilled attorney represented Henderson at the suppression hearing," the majority speculates, "he or she would have confronted the witnesses against Henderson and studied the Commonwealth's trial strategy, in the hopes of preparing a better attack on the factual environment of the confession at a trial by jury." Maj. Op. at 18. Accordingly, "the constitutional violation suffered by Henderson will not be corrected absent a new trial." Maj. Op. at 20.

Whatever merit one may find in the majority's view-- and I, for one, find none-- it should be enough for us as an inferior court that this position was litigated before the Supreme Court, and that it lost. The Supreme Court explicitly rejected the view that "the constitutional violation suffered by [the petitioner] will not be corrected absent a new trial," Maj. Op. at 20, and instead adopted the view that when the voluntariness of a defendant's confession is determined in violation of the defendant's rights,"there is

no constitutional prejudice . . . if the confession is now properly found to be voluntary and therefore admissible. If the jury relied upon it, it was entitled to do so." Jackson, 378 U.S. at 394.

In so ruling, the Supreme Court rejected the panel majority's view that a suppression hearing alone was insufficient to cure the wrong because the petitioner's position at trial might have been stronger had there been a proper suppression hearing before the trial. Such`what if 's do not rise to the level of "constitutional prejudice," the Court ruled, and thus are inappropriate bases for habeas relief. Id. This view is entirely consistent with the remainder of the Court's habeas jurisprudence, which has stressed that "granting habeas relief merely because there is a `reasonable possibility' that [the verdict was tainted by constitutional error] is at odds with the historic meaning of habeas corpus." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal citations omitted). See also Barefoot v. Estelle, 463 U.S. 880, 887 (1983) ("The role of federal habeas proceedings . . . is secondary and limited."). In other words, fashioning habeas relief based on unsupported speculation as to how a constitutional suppression hearing might have affected the petitioner's trial strategy would improperly "provide a totally unjustifiable windfall to a petitioner who has not been injured by the actions of which [the petitioner] complains." Koski v. Samaha, 648 F.2d 790, 798 (1st Cir. 1981).3

_____

3. The continuing viability of Jackson's conclusion that a constitutionally
proper suppression hearing cures the constitutional wrong when the original hearing was conducted in violation of the defendant's rights is illustrated by the Supreme Court's unanimous opinion in Waller v. Georgia, 467 U.S. 39, 50 (1984). In Waller, the Court held that a suppression hearing that (pursuant to a motion by the state) was closed to the public violated the defendant's Sixth and Fourteenth Amendment rights to a public trial. On direct review, the Supreme Court reversed the conviction, but concluded that a new trial was not required. Justice Powell wrote that "the remedy should be appropriate to the violation. If, after a new suppression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest." Id. at 50 (citing Jackson, 378 U.S. at 394-96). A new trial was necessary "only if a [constitutionally

30

Second, the majority suggests still another reason for its view that a new trial is required. According to the panel majority, we should be concerned that ordering a suppression hearing alone might improperly exceed a federal court's authority by improperly "revis[ing] the state court judgment." Fay v. Noia, 372 U.S. 391, 431 (1963). See also Barry v. Brower, 864 F.2d 295, 300 (3d Cir. 1988) ("Both the historic nature of the writ and principles of federalism preclude a federal court's direct interference with a state court's conduct of state litigation.") Maj. Op. at 14, 15. Although the majority never quite fleshes out how this could be the case, the idea that limiting the remedy to a suppression hearing might interfere with the state's sovereignty is astounding in light of Jackson and our own precedents.4 In Jackson, the Court held that it was limited to ordering a suppression hearing because ordering a full trial would interfere with the state's sovereignty. See Jackson, 378 U.S. at 395 ("[F]or us to impose th[e] requirement [of a new trial] . . . would not comport with the proper relationship between federal and state courts."); see also id. at 427 (Harlan, J., dissenting) (describing the majority's limited remedy as its "one bow to federalism"). Thus, the majority has suggested that it might be

_____

proper] suppression hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties." Id.

The fact that the Court concluded that a new suppression hearing cured the constitutional wrong on direct review in Waller is especially strong evidence that a new trial is an inappropriate remedy here. The Supreme Court has often stressed that the writ of habeas corpus is an extraordinary remedy, and that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." Brecht, 507 U.S. at 634. Given the much freer hand courts have in remedying constitutional wrongs on direct review, the fact that the unanimous court believed that a new trial was unnecessary on direct review in Waller strongly reinforces the conclusion in Jackson that it is unnecessary on habeas review.

4. See United States ex rel. Harvin v. Yeager , 428 F.2d 1354, 1358–59 (3d Cir. 1970); United States ex rel. Montgomery v. Brierley, 414 F.2d 552, 560 (3d Cir. 1969); United States ex rel. Dickerson v. Rundle, 363 F.2d 126, 130 (3d Cir. 1966).

31

constitutionally forbidden to do what the Supreme Court ruled it was constitutionally required to do-- condition the writ on the grant of a suppression hearing only. 5 I am at a loss to understand how this could be true.

C.

Distinguishing Jackson

The panel majority attempts to distinguish Jackson v. Denno by reeling off a list of "factors" that it claims makes Henderson's case "very different"-- even "completely different"-- from Jackson. The "sum of these factors," the majority proclaims, makes Jackson distinguishable and a new trial necessary to cure the constitutional wrong. Maj. Op. at 20. An examination of these "factors" shows that they each applied with equal force to Jackson v. Denno, and thus fail to provide any possible basis from which Jackson can be distinguished.

1.

The weakest of the majority's arguments that Jackson is distinguishable is that the denial of a Sixth Amendment right to counsel is generally considered a structural defect rather than a trial error under the framework provided by Arizona v. Fulminante, 499 U.S. 279 (1991).

I completely agree that the uncounseled suppression hearing suffered by Henderson was a structural defect in his trial. The problem is that the constitutional error in Jackson v. Denno was also a structural defect, for exactly the same reason: without conducting a new hearing, there was no way to determine how heavily constitutional error weighed into the jury's verdict. See Brecht, 507 U.S. at 629. In fact, in the two cases in which the Supreme Court

_____

5. The patent weakness of the majority's suggestion that a limited remedy might improperly "revise the state court judgment," Fay v. Noia, 372 U.S. 391, 431 (1963), is further illustrated by the fact that Justice Brennan, the author of Fay v. Noia, provided the fifth vote for the majority in Jackson one year later.

32

considered unconstitutional suppression proceedings and ruled that a new trial was not required to remedy the wrong, the errors were both structural defects. See Fulminante, 499 U.S. at 310 (noting that the error in Waller v. Georgia, 467 U.S. 39, 50 (1984)6  was a structural defect that "affect[ed] the framework within the trial proceeds, rather than simply an error in the trial process itself ").7

The error in the majority's analysis is that Fulminante's "structural defect"/ "trial error" doctrine is used exclusively to gauge whether a reviewing court needs to grant relief at all following a constitutional error. If the error is a structural defect, the court must grant relief; if it is a trial error, the court need not grant relief unless the admission of the tainted evidence "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 631 (citing Kotteakos v. United States, 328 U.S. 750, 776 (1946) (habeas)). Once the court has determined that it must grant relief, however, and turns to the separate question of what relief must be granted, the"structural defect"/"trial error" distinction drops out of the analysis and becomes completely irrelevant. Accordingly, the panel majority's emphasis on the fact that the constitutional wrong is a structural defect answers a question that has not been asked. It provides no guidance or help in determining what remedy is required to cure the constitutional defect.

_____

6. Discussed in note 3, supra.

7. Because Jackson was decided before the Supreme Court first introduced the harmless error doctrine in Chapman v. California, 386 U.S. 18 (1967), and nearly a quarter century before Fulminante formalized the distinction between structural defects and trial errors, the
Jackson opinion could not actually state that its error was a structural defect. However, we can be confident that the error in Jackson was a structural defect because 1) the Fulminante court specifically held that a nearly identical error in Waller was a structural defect, see Fulminante, 499 U.S. at 310, and 2) the error in Jackson was not something that could be "quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial." Brecht, 507 U.S. at 629.

Notably, the majority has not made any argument that the error in Jackson was not a structural defect.

33

2.

The majority also argues that this case is different from Jackson because the defect in Jackson was not the Sixth Amendment right to counsel present in this case, but rather a determination that "a conviction based upon a coerced confession . . . cannot withstand constitutional attack under the Due Process Clause of the Fourteenth Amendment." Maj. Op. at 17 (quoting Jackson, 378 U.S. at 377) (ellipsis in majority opinion). This, we are told, is a "completely different issue . . . that requires a completely different analysis." Id.

The flaw in this argument begins with the majority's gross misuse of ellipses to mischaracterize the holding of Jackson. The effect of the selective quotation is to foster the impression that the issue in Jackson was whether a confession was coerced, rather than, as here, whether a reliable evidentiary procedure was followed so that the defendant's rights to a fair trial were upheld. The entire sentence from which the majority selectively quotes is as follows:

> In our view, the New York procedure employed in this case did not afford a reliable determination of the voluntariness of the confession offered in evidence at the trial, did not adequately protect Jackson's right to be free of a conviction based upon a coerced confession and therefore cannot withstand constitutional attack under the Due Process Clause of the Fourteenth Amendment.

Jackson, 378 U.S. at 377 (emphasis added). As this quotation shows, the constitutional error in Jackson was not that Jackson's "conviction [was] based upon a coerced confession," as the majority states, but that the procedure "did not afford a reliable determination of the voluntariness of the confession" so that there was a substantial risk that Jackson's conviction was based upon a coerced profession.

As a matter of substance, the constitutional wrongs in the two cases were the same: the petitioners' confessions were determined in unreliable proceedings. Granted, the sources of the unreliability are different: in Jackson, the concern was that jurors would be unable to follow the

34

judge's instructions, whereas here, our concern is that a defendant proceeding without a lawyer would be unable to defend his case. The substance of the constitutional wrongs is the same, however: in both cases, the voluntariness of the confessions was the issue. Because the proceedings in which the voluntariness of the confessions was determined were unfair and unreliable, we just cannot be sure that the petitioners' convictions were based on voluntary confessions.

Finally, the constitutional wrongs are identical as a matter of form. Both wrongs are violations of the Fourteenth Amendment's Due Process Clause, which guarantees to state criminal defendants those federal guarantees listed in the Bill of Rights that are "fundamental and essential to a fair trial." Gideon, 372 U.S. at 340. The majority concedes that this was the wrong identified in Jackson, but then tries to pin the constitutional violation here on the Sixth Amendment, rather than the Fourteenth. Maj. Op. at 16–17, 21. However, Sixth Amendment guarantees apply to state proceedings only insofar as the Due Process clause of the Fourteenth Amendment includes them. See Gideon, 372 U.S. at 345. Therefore, this alleged difference is an illusion.

3.

The third and final "factor" that the majority lists as a ground for distinguishing Jackson is that the denial of counsel at Henderson's suppression hearing "may have had repercussions in plea bargaining, discovery, and trial strategy." Maj. Op. at 17. The participation of a skilled attorney at the suppression hearing "would have been beneficial to Henderson's defense," we are told, because it might have revealed weaknesses in the Commonwealth's case that could have only been uncovered in a pre-trial proceeding. Maj. Op. at 17. Even if the judge ruled that the confession was inadmissible, "a skilled attorney . . . would have confronted the witnesses against Henderson and studied the Commonwealth's trial strategy, in the hopes of preparing a better attack on the factual environment of the confession at a trial by jury." Id. at 18. This contrasts with Jackson, we are instructed, because in Jackson the only

35

harm suffered by the habeas petitioner was the absence of "an opportunity to have his confession suppressed-- the legal outcome of that hearing." Id. at 17. Thus, the majority claims that the jury in Henderson's trial "had too little information," whereas the jury in Jackson"arguably knew too much." Id. at 20.

Here the majority has manufactured a difference between the two cases by comparing apples and oranges: the possibility of actual prejudice in Henderson's case, as compared with the reality of constitutional prejudice in Jackson. If we apply the same scrutiny to both cases, however, we see that the reason stated for distinguishing Henderson's case from Jackson actually applies with equal force (or lack thereof) to Jackson's case.

In terms of actual prejudice, both Jackson and Henderson suffered a missed opportunity to "confront[ ] the witnesses against [them] and [to] stud[y] the Commonwealth's trial strategy [before trial], in the hopes of preparing a better attack on the factual environment of the confession at a trial by jury." Id. at 18. Neither petitioner was given an adequate opportunity to probe the prosecution's case against him until the trial itself, where all attempts to challenge the voluntariness of the confessions failed. If anything, Henderson fared substantially better on this count than did Jackson: at least Henderson's lawyer had available to him at trial a transcript of Henderson's uncounseled suppression hearing. In Henderson's case, this benefit was substantial, because Henderson managed to delve into the circumstances of his confession in substantially more depth than did Henderson's counsel at trial. In fact, the transcript of the uncounseled suppression hearing runs 54 pages; Henderson's entire defense, by comparison, is contained on only 21 pages.8

In contrast, Jackson had no opportunity whatsoever to probe the prosecution's case before trial. If the majority is right that such missed opportunities to gain tactical

_____

8. Compare App. 158-211 (uncounseled suppression hearing) with App. 298-319 (trial). Of course, the adequacy of Henderson's trial counsel is not at issue in this petition.

36

advantage are constitutionally relevant, then the case in which the absence of such opportunities most cries out for constitutional relief is Jackson's, not Henderson's. Cf. Jackson, 378 U.S. at 426 (Clark, J., dissenting) .

But of course the majority is not right. Jackson rejected the view that such possibilities were relevant, and instead adopted the view that there was "no constitutional prejudice" so long as a subsequent suppression hearing later revealed that the confession relied upon by the jury was properly before it. Id. at 394. In distinguishing between actual prejudice and constitutional prejudice, the Court reasonably tailored the constitutional remedy to the constitutional wrong. Because defendants do not have a constitutional right to an opportunity to gain a tactical advantage in pre-trial proceedings, the denial of such opportunities could not create constitutional prejudice that could be a relevant consideration in fashioning habeas relief. Applying this same standard to Henderson's case leads to the ineluctable conclusion that there could be no constitutional prejudice to Henderson if a subsequent suppression hearing later reveals that the confession relied upon by the jury was properly before it.

D.

This Court's conclusion that a new trial is required if a counseled suppression hearing reveals that Henderson's confession was properly admitted at trial is contrary to reason and directly clashes with the Supreme Court's holding in Jackson v. Denno. I therefore respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit